UNITED STATES DISTRICT COURT
WESTERN TEXAS DISTRICT
WACO DIVISION

| | | |
|---|---|---|
| JOANNE GALLEGOS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 6:20-cv-00237 |
| | § | |
| WAL-MART STORES, INC., | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

**COMES NOW** Joanne Gallegos ("Plaintiff" or "Gallegos"), by and through her legal counsel, and for her complaint against the Defendant Wal-Mart Stores, Inc., states as follows:

## PARTIES

1. Defendant Wal-Mart Stores, Inc., ("Wal-Mart" or "Defendant") is a Delaware corporation authorized to do and doing business in Texas, with retail stores throughout the state. Its corporate headquarters is located in Bentonville, Arkansas. Wal-Mart Stores, Inc. operates retail stores doing business as Wal-Mart Discount Stores, Wal-Mart Supercenters, Wal-Mart Neighborhood Markets and Sam's Clubs Stores (collectively "Wal-Mart") in Texas. Wal-Mart was/is also the employer of Plaintiff at all times relevant during the period giving rise to the subject liability set forth hereinbelow.

2. Plaintiff Gallegos is a resident of Waco, Texas and at all times relevant herein was employed by Defendant Wal-Mart Stores, Inc. for approximately fourteen (14) years from 1994-2008. Plaintiff Gallegos was employed at Wal-Mart Store #0939 located in Waco, Texas throughout her employment with Defendant.

## JURISDICTION AND VENUE

3. Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331, 1343(a)(4).

4. Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b) & (c). Plaintiff's claims arose primarily in Texas and give rise to the claims herein-alleged.

## NATURE OF THE CASE

5. Plaintiff is a former employee of Defendant Wal-Mart Stores, Inc. Plaintiff alleges that Wal-Mart illegally discriminated against her on the basis of her gender by paying her less than similarly-qualified or less-qualified male employees.

6. Plaintiff alleges that Wal-Mart discriminated against her based on her gender and that Wal-Mart's compensation policies and practices have had a disparate impact not justified by business necessity upon all of its female employees, including Plaintiff.

7. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq*., against Wal-Mart for its discriminatory practices against her based on her gender, as set forth herein.

2

**BACKGROUND – CASE HISTORY AND EXHAUSTION OF REMEDIES**

8. This action springs from *Dukes v. Wal-Mart*, 564 U.S. 338 (2011), the national class action filed more than ten years ago. In *Dukes*, the United States District Court for the Northern District of California certified a national class of female Wal-Mart (and Sam's Club, a division of Wal-Mart) employees challenging Wal-Mart's retail store pay and management promotion policies as being discriminatory against women. On June 20, 2011, the United States Supreme Court reversed that class certification order.

9. Plaintiff was a member of the national class certified in *Dukes*. While that certification order was working its way through the appellate process, time periods for filing EEOC charges and subsequent litigation for all former class members were tolled.

10. Following the Supreme Court's decision in *Dukes*, the United States District Court for the Northern District of California subsequently held that claims of class members would be tolled during the pendency of the national class action until the following dates: (1) former class members who had received a Notice of Right to Sue from the EEOC based on a claim encompassed by the former class definition would have until October 28, 2011, to file suit; (2) all other former class members in *non-deferral* states would have until January 27, 2012, to file a charge of discrimination with the EEOC based on conduct encompassed by the former class definition; and (3) all other former class members in *deferral* states would have until May 25, 2012, to file a charge of discrimination with the EEOC based on conduct encompassed by the former class definition. (*See* Judge Breyer's Order of August 19, 2011).

11. Plaintiff timely filed a charge of discrimination with the EEOC pursuant to the deadline set by the United States District Court for the Northern District of California's August 19, 2011, Order.

3

12. Plaintiff received a Notice of Right-to-Sue from the EEOC and this Complaint is being timely filed within 90 days of the receipt of such notice.

13. Plaintiff has therefore exhausted her administrative remedies and complied with the statutory prerequisites of Title VII by timely filing EEOC Charges of Discrimination.

14. The relevant time period in this action for Plaintiff's claims is based on the limitations period from *Dukes*. The limitations period starts on December 26, 1998, which is 300 days before the earliest charge filed with the EEOC by a former member of the *Dukes* class, and runs through the date of trial.

## FACTUAL ALLEGATIONS
### Organizational Structure and Hierarchy

15. In the time period relevant to this lawsuit, Wal-Mart's retail operations were divided geographically into six Wal-Mart divisions, each consisting of approximately six regions. Regions 9, 44, and 20 and Sam's Club 2 are largely based in Texas.

16. Each store in Regions 9, 44, and 20 and Sam's Club 2 had the same job categories, job descriptions and management hierarchy. At the bottom of the ladder, the primary entry-level hourly positions were Cashier, Sales Associate and Stocker.

17. The first step above an entry-level job was an hourly supervisor position, including Department Manager and Support Manager. The next step up was Management Trainee ("MIT"), a four-to-five-month program that prepared employees to be Assistant Managers, a salaried position. Each store had several Assistant Managers. The next level was Co-Manager, a position used only in larger stores, and the top level was Store Manager.

18. From 1998-2004, Store Managers set pay for hourly employees following Wal-Mart's guidelines governing compensation. Each Store Manager reported to their District Manager, and in order to maintain a consistent administration of the pay guidelines, certain hourly

4

pay decisions were reviewed by the District Manager for approval.  Specifically, exceptions to the pay guidelines, as well as some actions within the Guidelines (such as setting starting pay more than 6% above the minimum rate, *see infra* at [SEE SECTION BELOW RE: HOURLY PAY]) were reviewed by the District Manager, who had to decide whether or not to approve the Store Manager's pay decision.  Thus, the Store Managers received regular feedback from the District Managers about their decision-making.

19. District Managers reported to the Regional Vice President ("RVP").  In addition to the formal feedback from District Managers to Store Managers through the hourly pay exception process, both the RVP and District Managers spent a large amount of time touring stores and talking with the Store Managers in those stores.  Similarly, the RVP held regular in-person meetings and conference calls with all of the District Managers.  These regular meetings touched on many aspects of store operations, including "people issues."  Thus, there was a constant stream of communications with district and regional management that provided feedback to Store Managers about their hourly compensation decisions and guidance about how Wal-Mart regional management expected them to carry out their pay and promotion responsibilities.

20. The RVP also had overall responsibility for pay increases for Assistant Managers and had influence over promotions into MIT positions.

21. Regions 9, 20, and 44 and Sam's Club 2 also each had a Regional Personnel Manager ("RPM"), who was responsible for promotion into the MIT program and starting pay for MIT and Assistant Managers.

5

## PAY DISCRIMINATION

22. *Common Compensation Policies* ─ Wal-Mart had set compensation of store-based employees using a common set of guidelines, which Wal-Mart's managers had applied consistently throughout the store where Plaintiff worked. The pay guidelines established basic standards for setting pay rates at hire and subsequent pay adjustments for hourly and salaried employees.

**Hourly Pay**

23. *1998-2004 Hourly Pay Structure* ─ From 1998 through June 2004, Wal-Mart assigned jobs to five classes, the top two of which were only used for a few specialty jobs. Jobs were assigned to the same class regardless of department. Each successive job class had a higher minimum starting pay rate.

24. The minimum pay levels at hire ("start rates") for each job category were established for the store where Plaintiff had worked with the approval of the applicable District Managers and RVP. Thereafter, an employee's pay level could be adjusted: (1) after an initial probationary period; (2) if the employee was promoted to a higher job class or into management; (3) on an annual basis, if the employee satisfied minimum performance standards; or (4) if the employee had been awarded a special "merit" raise.

25. The Store Manager had the initial responsibility to set pay rates for individual hourly employees within the pay guidelines, subject to constraints set by the District Manager and RVP. Where a Store Manager set a pay rate above or below the pay guidelines, the rate was called an "exception."

26. The pay rate for a new employee could be set up to a maximum of $2 per hour above the start rate, but if the new employee's rate was more than 6% above the established start

6

rate for that pay class, a computer program in the payroll system would prohibit payment at this rate unless and until the Store Manager manually entered the pay rate for that employee.

27. All hourly pay exceptions were automatically reported to the District Manager, who could approve or disapprove such exceptions. The RPM was also informed of all hourly pay exceptions and was required to ensure that hourly compensation was consistent among employees in the Region.

28. In the store where Plaintiff worked, District Managers, the RPM, and the RVP regularly received reports of all employees whose hourly pay in a job category is/was more than 10% below or 5% above the average pay in that category. District Managers performed quarterly audits of each store's compliance with company policies and Region-specific policies, including compensation policies, which were then reported to the RPM and RVP.

29. District Managers and the RVP had ultimate authority over whether, and by how much, to adjust the pay of hourly employees, including those employees listed on exception reports.

30. In the store where Plaintiff has worked, managers were not required to use job-related criteria, such as job performance or experience, in setting, adjusting or approving compensation for individual employees. Managers did not document the reason(s) for setting, adjusting or approving the compensation of individual employees. The RVP and District Managers did not hold the Store Managers in the store where Plaintiff worked accountable for the factors the Store Managers used in making pay decisions or in ensuring that those factors comported with the law and did not discriminate against women, nor did they require any documentation of the reasons for the compensation paid to individual employees. Nor did Wal-Mart managers specify the weight to be accorded any particular requirement in setting or adjusting compensation.

7

31. *Patterns in Compensation* — Women who held hourly positions in the store where Plaintiff worked have been regularly paid less than similarly-situated men; although, on average, those women have more seniority and higher performance ratings than their male counterparts. This gender pay difference adverse to women exists even when nondiscriminatory objective factors, such as seniority, performance, store location and other factors are taken into account.

32. *Adverse Impact of Hourly Compensation Policies* — Wal-Mart's compensation policies, including its policy of using a set of prescribed factors to set starting pay for hourly associates at a pay rate above the minimum rate, as well as its policy of setting pay adjustments based on the associate's prior pay, have had an adverse impact upon its female employees in the store where Plaintiff worked, including specifically upon Plaintiff.

33. The RPM, RVP and District Managers have received, and continue to receive, regular reports about compensation for hourly and salaried employees within the store where Plaintiff worked, showing that female employees are paid less than men on average. These managers therefore had knowledge of the compensation discrimination present in the stores over which they had authority.

34. Because reasons for compensation decisions are not always documented, elements of Wal-Mart's compensation decision-making are not capable of separation for analysis.

35. *Post-2004 Pay Restructuring* — In 2004, Wal-Mart introduced a new pay structure, in which many jobs which had previously been in one pay class were assigned to separate classes depending on department. Pay rates differed depending on the pay class in which an hourly employee worked, and therefore the department in which that hourly employee worked.

36. The proportion of women in Wal-Mart's departments varied greatly. Many jobs in departments in which women were over-represented were assigned to lower job classes, while

8

those same job titles in departments over-represented by men were assigned to higher job classes. Wal-Mart's 2004 pay restructuring had an adverse impact on its female employees, including Plaintiff.

37. In 2005, Wal-Mart started giving newly hired employees "credits" for prior work experience. Because each credit was worth more to employees in higher job classes, the application of this credit policy exacerbated the pay disparities and had an adverse impact on female employees, including Plaintiff.

38. Then, in 2006, Wal-Mart added a cap on the pay permitted for each job class, further negatively impacting the pay of women relegated to the lower job classes, which had lower pay caps. This also had an adverse impact on female employees, including Plaintiff.

**Management Pay**

39. As with hourly compensation, Wal-Mart issued written guidelines governing management compensation. These written guidelines applied consistently throughout Regions 9, 20, and 44 and Sam's Club 2 and did not vary by district or store.

40. In most circumstances, these guidelines prescribed a formula for setting starting pay rates which, because it was largely based on prior pay rates, perpetuated disparities in pay adverse to women. However, exceptions could be sought, and external hires were not subject to the same formula, and in these instances a single decision maker—the RPM—decided pay.

41. *Management Trainee Pay* — Starting in 2002, the MIT pay rate for employees promoted internally was set based upon their pay as hourly employees. Thus, for those promoted from hourly positions, where women on average had lower hourly pay rates, their pay rates in the MIT program were lower than similarly-situated men, perpetuating the prior pay disparities.

9

42. While the pay rates for MIT participants who had been hourly Wal-Mart employees was largely governed by formula, the RPM generally was responsible for setting starting pay rates for external hires for whom no formula controlled. Higher pay offered to external candidates as compared to internally-promoted MITs provided another opportunity to pay men more than women in the MIT program.

43. In addition, any discretion permitted in approving exceptions to managerial pay rates, both for internal and external candidates, was exercised by the RPM.

44. Because the MIT program was for just a few months, there were no pay changes during the MIT program itself, but only upon successful completion and promotion to Assistant Manager.

45. *Assistant Manager Pay* — When trainees successfully completed the MIT program and became Assistant Managers, their pay was set by formula, initially $2,000 above MIT pay, which itself was directly tied to the hourly pay rate for internal promotes, as described above.

46. The pay for Assistant Managers who were external hires into the MIT program was also linked to their rate of pay while in the MIT program, but as described above, their MIT pay provided for higher compensation than for internal candidates. Any exceptions to these formulaic rules required approval of the RPM.

47. This formulaic use of prior pay rates to set starting Assistant Manager pay meant prior pay disparities adverse to women would be perpetuated. And the use of exceptions, all ruled on by a single individual RPM, provided the opportunity to create additional disparities adverse to women.

48. Assistant Managers also received performance evaluations and associated performance pay increases each year, all on the same date. These were prepared by the Store

10

Manager and District Manager, which were then reviewed and approved by the RVP. These performance increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay. Performance ratings, all approved by the RVP, could incorporate bias and unfairly rate female Assistant Managers lower than their peers.

49. In addition to performance increases, Assistant Managers could receive merit increases from 2002 to 2006, which had to be approved by the District Manager and RPM. These merit increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay. And they provided an opportunity for these decision makers to exercise bias in choosing whom to favor with these discretionary pay increases.

50. *Co-Manager Pay* —Co-Manager compensation was comprised of a base salary and profit sharing tied to the profitability of the Co-Manager's store. The RVP determined base salary and assigned the stores at which Co-Managers worked, the profitability of which affects the profit-sharing component of the compensation they receive. Because some stores are more profitable than others (*i.e.*, better location, fewer nearby competitors), store assignment is a critical component in determining Store Manager Salary. Women were often assigned to stores that generate lower profits and, as a result, were paid less than their male counterparts.

51. *Store Manager Pay* — A major part of a Store Manager's compensation is tied to store profitability. Performance evaluations are not a factor, nor is a Store Manager's ability to execute policies fairly. The RVP determined and assigned the stores at which Store Managers worked. Because some stores are more profitable than others (*i.e.*, better location, fewer nearby competitors), store assignment is a critical component in determining Store Manager Salary. Women were often assigned to stores that generate lower profits, and, as a result, were paid less than their male counterparts.

11

**WAL-MART MANAGERS RELY ON DISCRIMINATORY STEREOTYPES**

52. In the absence of job-related compensation criteria, Wal-Mart's managers in the store where Plaintiff worked, and those supervising the store where Plaintiff worked, relied on discriminatory stereotypes and biased views about women in making pay and promotion decisions.

53. A 1998 survey of Wal-Mart managers revealed that there was a "good ol' boy philosophy" at Wal-Mart, that many managers were "closed-minded" about diversity in the workplace and that some District Managers "don't seem personally comfortable with women in leadership roles."

54. The findings of the 1998 survey echoed an earlier 1992 report by a group of female Wal-Mart management employees, who identified a number of concerns for women employees, including the following: "Stereotypes limit the opportunities offered to women," "[c]areer decisions are made for associates based on gender," "[a]ggressive women intimidate men," "men are interviewed as the replacements, women are viewed as support," and "[m]en's informal network overlooks women."

55. All Wal-Mart Store Managers have been required to attend training programs at the company's Walton Institute. These managers were advised at the Institute that the reason there are few senior female managers at Wal-Mart is because men were "more aggressive in achieving those levels of responsibility" than women. Managers were cautioned that efforts to promote women could lead to the selection of less-qualified women over more-qualified men.

56. On or about January 24, 2004, at a meeting of all Wal-Mart District Managers presided over by Wal-Mart's CEO Thomas Coughlin, the District Managers were told that they were the key to running the stores: "You [the men] are the culture." The key to success was described as "single focus to get the job done. . . . Women tend to be better at information

12

processing. Men are better at focus single objective. Results driven." The District Managers were instructed to create a "culture of execution" and a "culture of results" as they picked "[f]uture leaders [men]."

## WAL-MART'S INEFFECTIVE ANTI-DISCRIMINATION EFFORTS

57. For many years, Wal-Mart had no meaningful policies or practices to hold managers in, or managers supervising, the store where Plaintiff worked accountable, financially or otherwise, to ensure equal employment and the implementation of diversity policies and goals.

58. Starting in 2000, Wal-Mart asked District Managers to set diversity "goals" for advancement of women in management. The goals were based on each manager's individual views on what was attainable and were not tied to any objective measures of availability or qualifications. Prior to 2004, failure to meet diversity goals had no financial or other consequence for managers in, or managers supervising, the store where Plaintiff worked.

59. As late as 2003, Wal-Mart CEO Coughlin was not aware of any diversity goals or whether managers had met such goals. Many Store Managers were also unaware of the existence of any diversity goals.

60. Until at least 2003, there had never been any diversity goal set for individual stores, nor for any compensation practices in the store where Plaintiff worked.

## PLAINTIFF GALLEGOS

61. Plaintiff Joanne Gallegos is a woman who lives in Waco, Texas. Plaintiff Gallegos was hired by Wal-Mart at Store #0939 located in Waco, Texas in 1994, and remained employed by Wal-Mart at that store through 2008 when she left Wal-Mart's employ.

13

62. Plaintiff Gallegos worked as a customer service manager, at the customer service manager desk, as an assistant department manager in the garden department, and as a department manager in the automotive department.

63. During her employment with Defendant at Store #0939, she witnessed many instances wherein male employees were paid more than female employees despite the male employees having unequal or less experience and tenure. It was common knowledge within the store that men were paid more than the females for similar or less work.

64. During her employment, Wal-Mart would tell her and other employees that it was against policy to discuss their pay rate or benefits with other employees. Plaintiff was told she would be written up and disciplined if she discussed her pay rate or benefits with other employees. This had a chilling effect as it prevented women from both knowing about the pay inequities and also scared them from complaining about the pay inequities they found out about.

65. Around 2004, Plaintiff heard from a number of her male co-workers that they were being paid much more than her because they were bragging about their pay rates. Without the benefit of discovery, Plaintiff recalls that Same Escalante, Steve Marquez, Roman Rodriguez, and Gabriel (whose last name is not remembered) mentioned what they were being paid per hour at the time (this was in 2004). Plaintiff recalls that these individuals were being paid $4.00 to $5.00 more per an hour than Plaintiff at the time.

66. At the time, Plaintiff has already worked at Wal-Mart for 10 years and she was aware that she had more tenure and experience than these men who were being paid more than her.

67. In 2004, Plaintiff actually saw the paystub of Sam Escalante because he left the paystub in the Store break room. His paystub showed that he was being paid about $18.00 an hour

14

and at the time she was being paid about $11.00 to $12.00 an hour. Plaintiff knew she was more experienced and tenured than Mr. Escalante.

68. Also during her employment, Plaintiff would frequently receive small annual raises of $0.25 an hour while at the same time she would hear the male employees boast about the $1.00 or even $2.00 per hour raises they were receiving. It was clear to Plaintiff that the men received larger raises on average than the women received.

69. Though Plaintiff worried about getting in trouble if she complained about her pay, she did complain several times, verbally, to male managers over the years during her employment at Wal-Mart. When she did so, her complaints were always met with inaction and indifference. She recalls being told that her information was "hearsay" and that she should not complain and that she does not know what she is talking about. After many such complaints wherein nothing changed, Plaintiff stopped complaining. Plaintiff does not recall the managers names at this time because the management within the store turned over on a regular basis. Plaintiff will need to seek discovery regarding managers and supervisors names in order to help her remember names.

70. Ms. Gallegos was a good employee for Defendant and her much lower pay rate compared to men was not warranted. For instance, when she moved from the assistant department manager position in the Garden Department to the department manager position in the Automotive department, within the first year in that position she set historically good performance marks for the low level of "shrink" within the department compared to her male predecessors. She received calls from managers in other stores congratulating her on her excellent performance regarding inventory and "shrink".

71. Ms. Gallegos witnessed several times wherein young and inexperienced males would be placed into supervisory and management positions rather than those positions being

15

given to females within the Store. For instance, during her tenure in the automotive department, Wal-Mart assigned Ms. Gallegos to work under a younger male supervisor who was cocky and an ineffective supervisor.

72. Throughout her employment at Wal-Mart, each instance wherein she learned of being paid less than males, each instance wherein she was told not to discuss her pay or benefits with other employees, and each instance wherein her complaints of pay inequality were scoffed at or swept under the rug, Ms. Gallegos suffered sadness, embarrassment, frustration, and anger due to Wal-Mart's discriminatory practices and policies.

73. Ms. Gallegos voluntarily resigned from Wal-Mart in 2008 after giving her two-weeks' notice. She resigned because of the pay and because Wal-Mart was instituting a cap on her pay that would require her to be paid on a salary basis and in which she would have to work for approximately six months on the overnight shift. At the time, Ms. Gallegos could not leave her school aged children and work the overnight shift.

## CAUSES OF ACTION
### Count I – Violation of Title VII (Disparate Treatment)

74. All prior paragraphs herein above and below are incorporated as though fully set forth herein.

75. The foregoing conduct violated Title VII of the Civil Rights Act of 1964.

76. Wal-Mart violated Title VII by paying Plaintiff less than similarly-qualified or less-qualified male employees.

77. Wal-Mart's discriminatory practices described above have denied Plaintiff compensation to which she was entitled, which has resulted in the loss of past wages and other job benefits.

78. Wal-Mart's discrimination complained of above was intentionally, willfully, wantonly and/or with reckless disregard for Plaintiff's rights. Plaintiff suffered compensatory damages in the form of pain and suffering, mental anguish, sadness, embarrassment, frustration, and anger. Plaintiff therefore seeks compensatory damages from Wal-Mart.

79. Wal-Mart has perpetrated said discrimination intentionally, willfully, wantonly and/or with reckless disregard for Plaintiff's rights, therefore rendering the Wal-Mart liable to the Plaintiff for an additional award of compensatory and punitive damages.

**Count II – Violation of Title VII (Disparate Impact Discrimination)**

80. All paragraphs herein above and below are incorporated as though fully set forth herein.

81. Wal-Mart has maintained a system for making decisions about compensation and promotions that has had an adverse impact on its female employees in the store where Plaintiff worked. Its compensation policies for setting and adjusting pay collectively and individually, including its failure to require or use job-related criteria for making compensation decisions, have had an adverse impact on women.

82. Wal-Mart has failed in the store where Plaintiff worked to create or maintain the data that would allow analysis of the impact of each of these policies and practices individually. Nor does Wal-Mart specify the weight that should be accorded to each of the requirements for pay. Wal-Mart's pay policies and procedures are thus not capable of separation for analysis, and accordingly the entire decision-making process for compensation decisions may be analyzed as one employment practice. 42 U.S.C. 2000e-2(k)(1)(B)(i).

83. Wal-Mart's compensation policies are not job-related or consistent with business necessity.

17

84. Wal-Mart's discriminatory practices described above have denied Plaintiff, and other female employees in the store where Plaintiff worked, compensation to which they are entitled, which has resulted in the loss of past wages and other job benefits.

85. Plaintiff requests relief as provided in the Prayer for Relief below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

a. All damages that Plaintiff has sustained as a result of Wal-Mart's conduct, including back pay, compensatory damages and general and special damages for lost compensation and job benefits that Plaintiff would have received but for the discriminatory practices of Wal-Mart;

b. Exemplary and punitive damages in an amount commensurate with Wal-Mart's ability to pay, sufficient to punish Wal-Mart and to deter future misconduct;

c. A declaratory judgment that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. §§ 2000(e), *et. seq.*, Title VII of the Civil Rights Act of 1964;

d. Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

e. Pre-Judgment and Post-Judgment interest, as provided by law; and

f. Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.

Dated: March 27, 2020

Respectfully submitted,

/s/ Joseph H. Gillespie
Joseph Gillespie, Esq.
Gillespie Sanford LLP
4925 Greenville Avenue, Suite 200
Dallas, Texas 7520
TX Bar: 24036636
Ph: 214-800-5112 | Fax: 214-838-0001
Email: joe@gillespiesanford.com
*Attorney for Plaintiffs – Lead Counsel*

/s/ Merit Bennett
Merit Bennett, Esq.
The Bennett Law Group
460 St. Michael's Drive, Suite 703
Santa Fe, New Mexico 87505
Ph:505-983-9834 | Fax: 505-983-9836
Email: mb@thebenettlawgroup.com
*Pro Hac Vice* soon to be filed

/s/ Stephen Tinkler
Stephen Tinkler, Esq.
The Tinkler Law Firm
414-A Old Taos Highway
Santa Fe, New Mexico 87501
Ph: 505-982-8533 | Fax: 505-986-6698
Email: set@tinklernm.com
*Pro Hac Vice* soon to be filed

19